UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

E-ONE, INC., f/k/a Emergency One, Inc., E-
ONE EUROPE BV,

                Plaintiffs,

v.                                       Case No.  5:05-cv-209-Oc-10GRJ

R. CUSHMAN & ASSOCIATES, INC., DRIVE
LINE SYSTEMS, BV, MTU DETROIT DIESEL
BENELUX, f/k/a MDB-Roodenburg,

                Defendants.
_____

## REPORT AND RECOMMENDATION[1]

      Pending before the Court is the Motion of Defendant Drive Line Systems B.V. To

Dismiss (Doc. 28) and supporting memorandum (Doc. 29); Defendant R. Cushman &

Associates, Inc.'s Motion To Dismiss For *Forum Non Conveniens* And In The

Alternative, For a Change Of Venue Based Upon The Parties' Forum Selection Clause

(Doc. 31); and MTU Detroit Diesel Benelux's Motion To Dismiss And/Or Quash Service

Of Process. (Doc. 34.)  Plaintiffs have filed responses to all three motions. (Docs. 49, 50

& 51.)   For the reasons discussed below, all three of the Defendants' motions are due

to be **DENIED**.

---

[1]Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

# I.  BACKGROUND

## A. The Parties

Plaintiff E-One, Inc., (hereinafter "E-One") which was formerly known as Emergency One, Inc., is headquartered in Ocala, Florida, and is a designer, manufacturer, and marketer of fire rescue vehicles.[2]  Plaintiff E-One Europe, BV (hereinafter "E-One Europe"), which is E-One's European affiliate, is a Dutch corporation.[3] E-One Europe is primarily in the business of marketing and selling fire rescue vehicles in Europe.[4]

Defendant Drive Line Systems B.V. (hereinafter "DLS") is a Dutch corporation with its principal place of business in Dordrecht, The Netherlands.[5]  DLS distributes transmission equipment in The Netherlands, Belgium and Luxemburg.[6]

MTU Detroit Diesel Benelux f/k/a MDB-Roodenburg (hereinafter "MTU")  is a Dutch corporation with its principal place of business in Dordrecht, The Netherlands.[7] MTU distributes and provides after-sales support for industrial engines.[8]  Prior to May

---

[2] See Doc. 59-2 (Supplemental Affidavit of Richard Grosso), ¶¶ 5 & 6 .  Richard Grosso was the former Manager/Director of International Business Development for E-One. See id., ¶3.

[3] See id.,¶ 66; Doc. 30 (Declaration of Kees Henssen),¶13 & Exhibit D.  Kees Henssen is the sole Managing Director of DLS.  See Declaration of Kees Henssen, ¶1.

[4] See Doc. 15 (Amended Complaint), ¶6.

[5] See Declaration of Kees Henssen, ¶1.

[6] See id., ¶3.

[7] See Doc. 35 (Declaration of Gert Jan van Erkel), ¶5. Gert Jan van Erkel is currently the Managing Director of MTU and previously served as Sales Director.  See Declaration of Gert Jan van Erkel, ¶3.

[8] See id.,¶6.

2004, MTU limited its activities to The Netherlands, however after May 2004, it extended its activities to include the countries of Belgium and Luxemburg.[9]

R. Cushman & Associates, Inc. (hereinafter "Cushman") is a Michigan corporation with its principal place of business in Livonia, Michigan.[10]  Cushman manufactures and sells various power transmission components, including power dividers.[11]

### B.    The Project

In May 2001, E-One, Inc. was awarded the contract to supply 34 Airport Rescue and Fire Fighting ("ARFF") Vehicles to The Royal Netherlands Air Force, The Royal Netherlands Navy, and the Amsterdam Airport Schiphol.[12]  This lawsuit arises from the engineering and manufacturing of power packs for these ARFF vehicles.[13]

The power packs were to be comprised of an engine, power divider, and a transmission, coupled together on a cradle.[14]  Allison Transmission, Inc. (who is not a

---

[9] See id.

[10] See Doc. 31-2 (Sworn Declaration of Richard Cushman),¶4.  Richard Cushman has been the owner and President of Cushman since 1985. See id., ¶3.

[11] See id., ¶5.

[12] See Supplemental Affidavit of Richard Grosso, ¶11.  The contract was subsequently increased to 36 ARFF Vehicles to the Air Force, Navy, and the Schiphol and Groningen Airports.  See id.,¶7.

[13] According to Plaintiffs, the specifications for the Project required them to create a new power source because the then available power sources could not meet the requirements for the ARFF Vehicles-- for example, the ARFF Vehicles had to travel 4200 meters with two ninety degree turns within 150 seconds. See Doc. 51, page 2.

[14] See Supplemental Affidavit of Richard Grosso, ¶18.  The power divider is installed between the engine and transmission and provides "pump and roll" capability by incorporating a clutch that disconnects the engine from the transmission.  See Sworn Declaration of Richard Cushman, ¶6.  "Pump and roll" capability allows a fire rescue vehicle to be stationary, pumping at maximum capacity with the engine at full speed, and also allows the rescue vehicle to be moved without having to slow down the engine or stop pumping in order to engage the transmission. See id.; see also, Doc. 51 at 2 (explaining that "the power divider does what its name suggests, it divides the power between the truck axles and the water pump at the same time and enables the trucks to perform so-called 'pump and roll' operations.")

party to this lawsuit) agreed to manufacture the transmission; Cushman agreed to supply the power divider; MTU agreed to supply the engine;[15] and DLS agreed to manufacture the cradle and be responsible for the overall design, material, and workmanship of the component parts of the power pack.[16]

Pursuant to the document entitled "RNLAF/RNLN/Schipol ARFF Vehicle Bid Proposal Statement of Work" (edited November 1, 2000 and revised June 4, 2001) E-One was the "prime bidder" and E-One Europe was a subcontractor to supply materials, labor, facilities and production management.[17]  The document further provided that E-One was responsible for the complete assembly of the initial two vehicles at its Ocala facility and that "DLS may drop ship all US made components to Ocala for the first two trucks and send their people for assembly in Ocala to save time in shipping."[18]

On August 30, 2001, DLS placed a purchase order for 34 power dividers with Cushman, which Cushman accepted on August 31, 2001.[19]  Cushman sent an acknowledgment form that provided *inter alia* that the contract would be "interpreted in accordance with and governed by the laws of the State of Michigan" and that DLS

---

[15] MTU Detroit Diesel Benelux's predecessor company MDB-Roodenburg agreed to supply the engines.

[16] See id. at ¶¶ 19-22; Amended Complaint at ¶¶27-32.

[17] See Declaration of Ad Kornet, ¶7 & Exhibit C; Supplemental Affidavit of Richard Grosso, ¶¶15-16.

[18] See Declaration of Ad Kornet, ¶7 & Exhibit C; Supplemental Affidavit of Richard Grosso, ¶¶15-16.

[19] See Declaration of Ad Kornet, ¶9; Declaration of Richard Cushman, ¶10 & Exhibit A.

"consents to personal jurisdiction and venue in state or federal court in Wayne or Oakland County, Michigan."[20]

On or about September 14, 2001, DLS sent a proposal to E-One for the engine, power divider and transmission.[21]  The proposal did not specify where the component parts were to be shipped or where the power packs would be assembled and tested.[22] On September 25, 2001, Ad Kornet (on behalf of DLS) and Richard Grosso (on behalf of E-One), executed a Warranty Agreement regarding the project.[23]  On September 27, 2001, Mr. Grosso sent a purchase order to DLS (Purchase Order #419939, hereinafter the "First Purchase Order") covering the first six power packs and providing that the first four power packs would be assembled in Ocala, Florida.[24]  The "Terms and Conditions of Purchase" on the back of the First Purchase Order included the following provision:

> 16. APPLICABLE LAW.  This contract shall be governed by Florida law and suits related hereto shall be brought in the state or federal courts for Ocala, Florida and the Seller consents to such jurisdiction and agrees to accept service therefor. . .

---

[20]  See Declaration of Richard Cushman, Exhibit A.

[21]  See Amended Complaint, Exhibit A.; Supplemental Affidavit of Richard Grosso, ¶33.

[22]  Nevertheless, Mr. Grosso attested that at this time the parties agreed that at least four power packs and their component parts were to be shipped to, assembled in, and tested in Ocala and installed into the first four chassis in Ocala.  See Supplemental Affidavit of Richard Grosso, ¶34. DLS has offered conflicting affidavit testimony from Mr. Kornet who attested that at the time of this proposal, all of the power packs were to be delivered by DLS to E-One Europe.  See Declaration of Ad Kornet, ¶10.

[23]  See Amended Complaint, ¶33 & Exhibit B.  Mr. Kornet and Mr. Grosso disagree as to where this agreement was executed.  According to Mr. Kornet, it was executed in the Netherlands on or about September 24, 2001 (see Declaration of Ad Kornet, ¶10), while Mr. Grosso contends that it was executed in Ocala on September 25, 2001.  See Supplemental Affidavit of Richard Grosso, ¶¶38-45.

[24]  See Amended Complaint, Exhibit C; Supplemental Affidavit of Richard Grosso, ¶47; Declaration of Ad Kornet, ¶11.  While Mr. Grosso attests that the First Purchase Order provided that the first four power packs would be assembled in Ocala, Florida (and no party offers conflicting evidence), the Court has been unable to find this language in the document.  However, the First Purchase Order does provide for assembly labor "associated with Ocala, Florida assembly of first three (3) units."

On December 14, 2001 DLS executed a promissory note in favor of Emergency One, Inc. (which was later renamed E-One, Inc.) in which DLS agreed to pay on demand the principal sum of $1,000,000.00.[25]  On or about December 19, 2001, MDB-Roodenburg, which was later acquired by MTU, issued a bank guarantee in favor of "Emergency one, Inc., P.O. Box 2710, Ocala Fl 34479-2710 United States of America in the amount of $1,000,000.00 to secure E-One's prepayment to DLS of $1,000,000.00.[26] The bank guarantee recited that DLS had entered into a contract with "Emergency one, Inc., P.O. Box 2710, Ocala, Fl 34479-2710 United States of America . . . for the delivery of 34 powerpacks in accordance with purchase order number 419939 dated September 27th, 2001."[27]

In January 2002, E-One learned that its computer system (BAAN) could not handle the currency conversion required to account for the inlays and outlays for the project, as the purchase price was a blended ratio between U.S. Dollars and Euros.[28] To overcome this accounting problem, E-One decided to produce new purchase orders using its European affiliate, E-One Europe, as the purchasing entity, because it used a different computer system.[29]

---

[25] See Supplemental Affidavit of Richard Grosso, ¶61 & Exhibit 15.

[26] See id., ¶62 & Exhibit 16.

[27] See id., Exhibit 16.

[28] See Supplemental Affidavit of Richard Grosso, ¶65.

[29] See id., ¶66; see also Doc. 32, Exhibit F (January 10, 2002 email from Richard Grosso to Ad Kornet advising that"[i]t is our plan to cancel all of the open balances on the existing E-One Ocala purchase orders and re-enter with new E-One Europe Purchase Orders to replace anyway.  Our finance department is having problems with our BaaN software also and E-One Europe doesn't have that problem since it is a very informal Microsoft system.")

Then on February 14, 2002, E-One Europe (and not E-One)  issued a purchase order to DLS for all 34 power packs (hereinafter the "Second Purchase Order.")[30]  Prior to issuing the Second Purchase Order, E-One already had received several of the component parts for the power packs; DLS had shipped the cradles for the first two power packs and its tools to Ocala, Florida; and E-One had begun to build the first prototype ARFF Vehicle in Ocala, Florida.[31]   The Second Purchase Order provided that the components for the first six power packs would be delivered to and assembled in Ocala, Florida and that the remaining twenty eight power packs would be assembled in The Netherlands.[32] The Second Purchase Order noted that all related correspondence, shipping papers and invoices should reference "E-One Europe PO #184, E-One Ocala PO #422049."  In addition, the Second Purchase Order listed "R J Grosso" as the requisitioner and provided that any questions regarding the purchase order should be sent to his attention.  Attached to the Second Purchase Order was a copy of the Warranty Agreement signed by Richard Grosso and Ad Kornet and  E-One Europe's Standard Conditions of Purchase  which included the following provision:

24.    LAW AND JURISDICTION

These Conditions and each and every Contract shall be
(a) governed by English law; and
(b) subject to the jurisdiction of the English Courts
Provided that the Buyer shall in its absolute discretion be entitled to refer any dispute to arbitration by a single arbitrator appointed (on the Buyer's application) by the President for the time being of the Newcastle Law Society.

---

[30] See Amended Complaint, ¶41 & Exhibit E; Supplemental Affidavit of Richard Grosso, ¶70.

[31] See Supplemental Affidavit of Richard Grosso, ¶71.

[32] See Amended Complaint, Exhibit E; Declaration of Ad Kornet, ¶16 & Exhibit G.

The components for the first two power packs were sent to E-One in Ocala, Florida, where they were to be assembled for the first time and then installed in the prototype ARFF Vehicles.[33]  DLS sent several employees to E-One to assemble the first two power packs and install them into the ARFF Vehicles.[34]  Subsequently, at least four additional power packs were sent to Ocala, Florida, where they were installed in ARFF vehicles.[35]

Because the component parts had never been integrated together into one power pack, prototype testing was required.[36]  During prototype testing of the first two ARFF Vehicles in Ocala during mid-2002, both ARFF Vehicles failed.[37]  DLS, Cushman and MTU sent representatives to E-One in Ocala to investigate and diagnose the cause of the failures.[38]  In addition, DLS hired Florida Detroit Diesel-Allison North, Inc.

---

[33] Although Plaintiffs and DLS allege that Cushman, MTU and Allison sent the components directly to Ocala, Florida (see Amended Complaint, ¶49; Supplemental Affidavit of Richard Grosso, ¶ 115; Affidavit of Kees Henssen, ¶8), Cushman and MTU have offered conflicting affidavit evidence. Mr. Cushman attests that Cushman delivered the first four power dividers to DLS FOB Livonia, Michigan. See Declaration of Richard Cushman, ¶17. Mr. van Erkel attests that MTU delivered six engines to DLS FOB Detroit and the remaining engines to DLS FOB Ridderkerk, The Netherlands. See Declaration of Gert Jan Van Erkel, ¶¶11 & 12.

[34] See Supplemental Affidavit of Richard Grosso, ¶¶87 & 89.

[35] There is some dispute as to whether the subsequent power packs were assembled in Ocala or assembled in The Netherlands and then sent to E-One in Ocala for installation. Richard Grosso attests that at least three power packs were assembled in Ocala and that seven power packs were ultimately installed in ARFF Vehicles in Ocala. See Supplemental Affidavit of Richard Grosso, ¶48 & 108. Kees Henssen attests that all subsequent power packs (after the initial two) were assembled in the Netherlands and that only six power packs were installed in ARFF Vehicles in Ocala. See Declaration of Kees Henssen, ¶¶ 9-10.

[36] See Doc. 53 (Affidavit of Madhu Manikkam), ¶14. Mr. Manikkam is employed as an Engineering Manager at E-One and was responsible for ARFF Vehicle engineering during this project. See id., ¶¶4 & 6.

[37] See id., ¶17; Amended Complaint, ¶50.

[38] Mr. Manikkam, who was responsible for ARFF Vehicle engineering for E-One during this project, attested that he worked with the following people regarding this project: (1) Ad Kornet (DLS and MTU); (2) Edwin Smits (DLS); (3) John Nash (MTU); (4) Eric Klaasse (MTU); (5) Alex Romijn (MTU); (6) Rein Mulder (Mechanic for MTU/DLS); (7) Kees Henssen (DLS); (8) Marc Van Iersel (DLS); (9) J.B. Derderian (Engineer for Cushman); (10) Chris Chandler (Sales rep. For Cushman); (11) Tino Versijde (Engineer for MTU). See Affidavit of Madhu Manikkam, ¶19; Amended Complaint, ¶¶57-58; Supplemental Declaration of Richard Grosso, ¶¶ 87-88.

(hereinafter "Florida Detroit Diesel") a Florida corporation located in Ocala, to repair one of the power packs.[39]   DLS also hired JVS Scheeps-En-Industrietechniek B.V. (hereinafter "JVS") and to help diagnose the cause of the failures.[40]   JVS conducted testing on the ARFF Vehicles at E-One's facility in Ocala, Florida and issued a Report on October 10, 2002.[41]   Plaintiffs allege that they delivered the first ARFF Vehicles to the customers in The Netherlands and that despite corrective measures taken, the ARFF Vehicles experienced failures almost immediately.[42]  Plaintiffs further allege that in December 2003, a significant torsional vibrational problem was discovered which caused the shafts within the power divider to fracture and the power packs to fail.[43]  As a result of this discovery, DLS hired Techno Fysica B.V. to determine the cause of the continued failures.[44]

### C. Procedural Background

Plaintiffs then filed the instant action.  The Amended Complaint (Doc. 15) consists of twenty-one counts.  Plaintiffs allege breach of contract claims in Counts One through Five against all Defendants; breach of warranty claims (i.e., express, implied, fitness for particular purpose, and covenant of good faith and fair dealing) in Counts Six through Seventeen against all Defendants; negligent misrepresentation in Counts

---

[39] See Supplemental Affidavit of Richard Grosso, ¶¶85-86.

[40] See id., ¶¶ 91-93.

[41] See id., ¶¶ 93-94 & Exhibit 20.

[42] See Amended Complaint, ¶62.

[43] See id., ¶65; Affidavit of Madhu Manikkam, ¶¶22-23.

[44] See Affidavit of Madhu Manikkam, ¶24 & Exhibit 1.

Eighteen and Nineteen against Cushman and MTU; negligence in Count Twenty against all Defendants; and breach of contract and breach of warranty claims in Count Twenty-One against DLS regarding additional problems with a specific ARFF Vehicle.

DLS has moved to dismiss Plaintiffs' Amended Complaint on three grounds. First, DLS argues that this action should be dismissed for improper venue pursuant to Rule 12(b)(3) because every alleged claim for relief arises out of a contract that contains England choice-of-forum and England choice-of-law clauses.  Second, DLS contends that the Court lacks personal jurisdiction under the Florida long-arm statute and constitutional due process requirements.  Third, DLS argues that this action should be dismissed on the basis of *forum non conveniens* because the Netherlands or England would be a more convenient forum.

Cushman argues that this action should be dismissed on the basis of *forum non conveniens*.  However, Cushman represents that if the Court determines that this action should proceed in England then it would agree to jurisdiction of the English Court. Alternatively, if the Court finds that the action should remain in the United States, Cushman seeks a change of venue to a Michigan District Court pursuant to 28 U.S.C. §1404(a) based on a forum selection clause in its agreement with DLS.

MTU contends that this action should be dismissed or service of process should be quashed because this Court lacks personal jurisdiction.  MTU also filed a notice in

which it joined and adopted DLS's motion to transfer venue to England or The

Netherlands on the basis of *forum non conveniens.* (Doc. 37.)[45]

## II.  DISCUSSION

### A.    Personal Jurisdiction

DLS and MTU both argue that they are not subject to *in personam* jurisdiction in

Florida because they are Dutch corporations without the contacts necessary for the

court to assert jurisdiction.  A court must address a challenge to its exercise of personal

jurisdiction before looking at the other claims in a motion to dismiss.[46]  Plaintiffs initially

must establish a *prima facie* case of personal jurisdiction over a nonresident defendant.

"A *prima facie* case is established if the plaintiffs present sufficient evidence to defeat a

motion for a directed verdict."[47]  The burden then shifts to the defendant to file affidavits

containing allegations that, if taken as true, show that the defendant's conduct does not

make him or her amenable to service.[48]  Where a defendant submits such affidavits, the

burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction

-- unless the affidavits contain only cursory assertions that the defendant is not subject

to jurisdiction.[49]  Where the plaintiff's complaint and supporting evidence conflict with the

---

[45] Plaintiffs argue in a footnote that MTU waived the defense of improper venue by not raising it in its Rule 12(b) motion.  See Doc. 49, n. 1.  However, the Court need not address this argument, because it does not change the Court's analysis of venue in this case.

[46]  Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990).

[47] Cable/Home Communication Corp. v. Network Prods., Inc., 902 F.2d 829, 855 (11t Cir. 1990) (quoting Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir. 1988)).

[48]  Acquadro v .Bergeron, 851 So.2d 665, 672 (Fla. 2003).

[49] Meier ex rel. Meier v. Sun Intern. Hotels, Ltd., 288 F.3d 1264, 1269 (11th Cir. 2002).

defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.[50]

In the instant case, Plaintiffs have made the requisite *prima facie* showing in their Complaint.  Accordingly, the burden shifted to Defendants to show that the Court does not have personal jurisdiction.  Along with their motions to dismiss (Docs. 28, 31 & 34), Defendants submitted several affidavits.[51]  Because Defendants have produced non-cursory affidavits in support of their jurisdictional challenge, the burden shifts to Plaintiffs to produce evidence supporting an exercise of *in personam* jurisdiction.   Plaintiff has offered additional support through affidavits filed in response to the motions to dismiss.[52]

In determining whether the court has personal jurisdiction over a nonresident defendant the court employs a two-part analysis.[53]  First, the court must determine if jurisdiction can be obtained over the defendants under Florida's long-arm statute.[54] If so, the court must then decide whether the nonresident defendants have sufficient "minimum contacts" with Florida to satisfy the constitutional requirements under the Due Process Clause of the Fourteenth Amendment so that maintenance of the suit "does not offend

---

[50]See id.

[51] DLS submitted the Declaration of Kees Henssen (Doc. 30), the Declaration of Ad Kornet (Doc. 32), and the Declaration of Ruben A. W.J. Van Eijck (Doc. 33); MTU submitted the Declaration of Gert Jan van Erkel (Doc. 35) and the Supplemental Declaration of Ad Kornet (Doc. 68); and Cushman filed the Declaration of Jan Willem De Groot (Doc. 31) and the Sworn Declaration of Richard Cushman (Doc. 31-2).

[52] Plaintiffs submitted the Supplemental Affidavit of Richard Grosso (Doc. 59), the Affidavit of Madhu Manikkam (Doc. 53) and the Affidavit of Rebecca Brown (Doc. 54).  As the Court was preparing to issue this Report and Recommendation, Plaintiffs also filed the Affidavit of Kevin B. Cook. (Doc. 76.)

[53] Horizon Aggressive Growth v. Rothstein-Kass, 421 F.3d 1162, 1166 (11th Cir. 2005).

[54] See id.

'traditional notions of fair play and substantial justice.'"[55]  Even if jurisdiction is found under Florida's long-arm statute, a separate review of the facts must be undertaken by the court to determine if the constitutional test is met.[56]

### 1.  Florida's Long-Arm Statute

Because Florida law dictates the reach of the long-arm statute, this Court must interpret it in the same way that the Florida Supreme Court would.[57]  Therefore, this Court must strictly construe the statute,[58] and Plaintiffs bear the burden of proving the facts which make the long arm statute applicable to the Defendants.[59]  Florida's long-arm statute provides for two types of personal jurisdiction: specific jurisdiction under §48.193(1), where a party's contacts with the forum relate to the cause of action and general jurisdiction under §48.193(2), where a party's contacts are unrelated to the litigation, but nonetheless are "continuous and systematic," such as owning property, running a business, or maintaining a bank account.

### DLS

Plaintiffs argue that the Court has personal jurisdiction over DLS because DLS "breach[ed] a contract in this state by failing to perform acts required by the contract to

---

[55] Id.

[56] See Cable/Home Communication, 902 F.2d at 856 (quoting Venetian Salami Co. v. Parthenais, 554 So.2d 499, 500 (Fla. 1989)).

[57] Horizon Aggressive Growth, 421 F.3d at 1167.

[58]Madara, 916 F.2d at 1514.

[59] Restorative Prods., Inc. v.  Mmar Med. Group, Inc., No. 94-1920 CIV-T-17A, 1995 U.S. Dist. LEXIS 18695, at *5 (M.D. Fla. Oct. 18, 1995); Bloom v. A. H. Pond Co., Inc., 519 F. Supp. 1162, 1168 (S.D. Fla. 1981).

be performed in this state."[60]   Plaintiffs have alleged that DLS contracted to deliver six

power packs to Ocala, Florida and that it breached the contract by delivering defective

power packs.  The alleged breach --i.e., delivering defective power packs -- provides a

basis for obtaining *in personam* jurisdiction over DLS under Florida's long-arm statute.[61]

Nevertheless, DLS argues that this subsection of the long-arm statute is not

applicable because the First Purchase Order was superseded by the Second Purchase

Order -- and the Second Purchase Order was between DLS and E-One Europe, not E-

One.  However, even if the Second Purchase Order governs, and even if E-One was not

a party to the Second Purchase Order, DLS was still contractually required to deliver six

power packs to E-One in Ocala, Florida.

Alternatively, Plaintiffs argue that this action is properly maintained in this Court

pursuant to §685.102, Florida Statutes (2005), which is an exception to the long-arm

statute. Section 685.102 provides:

(1) Notwithstanding any law that limits the right of a person to maintain an
action or proceeding, any person may, to the extent permitted under the
United States Constitution, maintain in this state an action or proceeding

---

[60] Florida's long arm statute, § 48.193(1), provides in relevant part that:

[a]ny person, whether or not a citizen or resident of this state, who personally or
through an agent does any of the acts enumerated in this subsection thereby
submits himself or herself . . . to the jurisdiction of the courts of this state for any
cause of action arising from doing any of the following acts:
. . .

(g) Breaching a contract in this state by failing to perform acts required by the
contract to be performed in this state.

While Plaintiffs also alleged in their complaint that DLS "engages in substantial and not
isolated activity within the State of Florida" (Doc. 15, ¶14), they do not argue that the
Court has personal jurisdiction pursuant to the general jurisdiction provision of the long-
arm statute.  Accordingly, the Court does not address general jurisdiction.

[61] See e.g., Aetna Life & Cas. Co. V. Therm-O-Disc, Inc., 488 So.2d 83, 87 (Fla. App. Ct. 1986).

14

against any person or other entity residing or located outside this state, if the action or proceeding arises out of or relates to any contract, agreement, or undertaking for which a choice of the law of this state, in whole or in part, has been made pursuant to s. 685.101 and which contains a provision by which such person or other entity residing or located outside this state agrees to submit to the jurisdiction of the courts of this state.

Section 685.101 provides that parties to a contract involving not less than $250,000.00

"may, to the extent permitted under the United States Constitution, agree that the law of

this state will govern such contract . . ."

Plaintiffs argue that the forum selection clause included in the First Purchase

Order is an agreement pursuant to §685.101 and §685.102.  The clause provides:

This contract shall be governed by Florida law and suits related hereto shall be brought in the state or federal courts for Ocala, Florida and the Seller consents to such jurisdiction and agrees to accept service therefor. . .

Because it is undisputed that the First (and Second) Purchase Order involved more

than $250,000.00 and none of the exceptions to §685.101 apply, the choice of law

clause is valid.  Moreover, because the forum selection clause expressly provides that

DLS consents to jurisdiction in "the state or federal courts for Ocala, Florida," section

685.102 provides another basis for the Court to exercise jurisdiction over DLS.[62]

---

[62] See Steller Group, Inc. v. Mid-Ohio Mechanical, Inc., No. 3:03-cv-1057-J-20HTS, slip op. at 2-3 (applying §685.101 and §685.102).  DLS might attempt to argue that this statute is not applicable because the Second Purchase Order (with the England forum selection clause) superseded the First Purchase Order. Even so, Plaintiffs have offered unrefuted evidence that prior to the issuance of the Second Purchase Order, E-One had already received several of the component parts for the power packs and that DLS had shipped the cradles for the first two power packs and its tools to Ocala, Florida. See Supplemental Affidavit of Richard Grosso, ¶71.

**MTU**

Plaintiffs contend that the Court has personal jurisdiction over MTU because MTU "committ[ed] a tortious act within this state."[63]  MTU argues that Plaintiffs have not alleged that MTU took any action in Florida essential to the success of the alleged torts.

However, Plaintiffs have alleged *inter alia* that MTU breached a duty by failing to properly diagnose the cause of the power pack failures.[64]  Plaintiffs have further alleged that representatives of MTU traveled to Ocala to investigate and diagnose the cause of the failures.[65]  Plaintiffs contend that they would not have incurred significant injury, and likely would have incurred no injury at all, if MTU had properly diagnosed the cause of the failures in the prototypes while in Florida.[66]  These allegations, if true, are sufficient to establish jurisdiction over MTU under the long-arm statute.

Moreover, even if MTU's negligence was committed outside of Florida, Plaintiffs have alleged facts, demonstrating that E-One's injury occurred in Florida.  Plaintiffs offered the affidavits of Mr. Grosso and Ms. Browne, both of whom attested that E-One suffered significant injury in Florida.[67]  While recognizing the split among Florida courts, the Eleventh Circuit has consistently held that a defendant who commits a tortious act

---

[63] Plaintiffs also alleged in their Complaint that MTU "engages in substantial and not isolated activity within the State of Florida" and MTU "breached a contract in this State by failing to perform acts required by the contract to be performed in this State." Doc. 15, ¶¶20 & 22. However, Plaintiffs do not substantively address these bases for jurisdiction in their response to the motion to dismiss.  Accordingly, the Court does not address them in this Report and Recommendation.

[64] See Amended Complaint, ¶179.

[65] See id., ¶¶57-58.

[66] See Doc. 49, pages 9, 11-12.

[67] See Supplemental Affidavit of Richard Grosso, ¶107; Affidavit of Rebecca Browne, ¶¶5-6.

outside the state resulting in injury inside the state is subject to personal jurisdiction in Florida.[68] Other than arguing that Plaintiffs did not sustain any damages in Florida, MTU has not offered any evidence to refute E-One's allegations and affidavits.

Accordingly, this Court has personal jurisdiction over MTU pursuant to subsection (1)(b) of the long-arm statute -- both because MTU allegedly breached a duty in Florida and because Plaintiffs allegedly suffered injury in Florida.

### 2. *Due Process*

Having determined that the claims against the Defendants fall under the Florida long-arm statute, the Court must next determine whether each individual defendant has sufficient minimum contacts with the forum to satisfy the due process requirements of the Fourteenth Amendment of the Constitution so that the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice."[69]

The Eleventh Circuit utilizes a three-part test to decide whether there are sufficient minimum contacts:

> [f]irst, the contacts must be related to the plaintiff's cause of action . . . Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . Third, the defendant's contacts with the forum must be such that the defendant should reasonably anticipate being haled into court there.[70]

---

[68] See Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1217 (11th Cir. 1999)(recognizing split among the Florida appellate courts and holding that "we are bound in this case to follow [the Eleventh Circuit's] firmly established precedent, which interprets subsection (1)(b) to apply to defendants committing tortious acts outside the state that cause injury in Florida"); Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 257 (11th Cir. 1996); Sun Bank, N.A. v. E.F. Hutton & Co., 926 F.2d 1030, 1033-34 (11th Cir. 1991).

[69] Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

[70] Posner v. Essex Ins. Co., 178 F.3d 1209, 1220 (11th Cir. 1999) (quoting Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1546 (11th Cir. 1993)).

Each defendant's contacts with the forum State must be assessed individually rather than simply viewing them collectively.[71]   As discussed above,  the minimum contacts alleged by Plaintiffs are directed to the cause of action and therefore relate to specific jurisdiction. Accordingly, the first part of the test - i.e. that the contacts are related to the cause of action - is established.  The Court will now address the contacts of DLS and MTU individually.

**DLS**

In support of its argument that the court has jurisdiction over DLS, Plaintiffs allege in their complaint and through affidavits numerous contacts that DLS had with the State of Florida.  Except as noted below, DLS does not refute these contacts; rather, it contends that these contacts are not sufficient to meet the requirements of due process.

(1) Ad Kornet, as sole Managing Director of DLS, visited E-One in Ocala, Florida on five occasions regarding this project -- during October or November 2000; January 2001; September 2001; November 2001; and February 2002.[72]

(2) Kees Henssen, who became the sole Managing Director of DLS on April 1, 2002, visited E-One on three occasions related to this project -- February or March 2002, May or June 2002, and September 2002;[73]

---

[71] See Calder v. Jones, 465 U.S. 783, 790 (1984).

[72] See Declaration of Ad Kornet, ¶19; Supplemental Affidavit of Richard Grosso, ¶13 & Exhibit 2; Doc. 68 (Supplemental Declaration of Ad Kornet), ¶5.

[73] See Supplemental Declaration of Richard Grosso, ¶90; Declaration of Kees Henssen, ¶11.

(3) DLS entered into an agreement with E-One in which it agreed to deliver the components for the first six power packs to Ocala, Florida and assemble them in Ocala, Florida;[74]

(4) DLS entered into the Warranty Agreement with E-One;[75]

(5) Pursuant to the First Purchase Order, DLS consented to jurisdiction in Florida and venue in the state or federal courts of Ocala;[76]

(6) DLS shipped its tools to Ocala, Florida in anticipation of assembling the power packs;[77]

(7) DLS sent its mechanics and engineers to Florida to assemble and test the power packs;[78]

(8) DLS shipped at least four additional power packs to Ocala, Florida, where they were installed in ARFF vehicles.[79]

---

[74] DLS contends that the Second Purchase Order superseded the First Purchase Order and that the Second Purchase Order was between E-One Europe and DLS -- not E-One.  However, it is undisputed that the First Purchase Order was between E-One and DLS and that pursuant to both purchase orders DLS agreed to deliver the components for the first six power packs to Ocala, Florida and assemble them in Ocala, Florida.

[75] While the parties dispute where the warranty agreement was executed, there is no dispute that DLS and E-One entered into the agreement.  See Declaration of Ad Kornet, ¶10; Supplemental Affidavit of Richard Grosso, ¶¶38-45.

[76] See Amended Complaint, Exhibit C.

[77] See Supplemental Affidavit of Richard Grosso, ¶60.

[78] See id., ¶¶87-90; Declaration of Kees Henssen, ¶8

[79] There is some dispute as to whether the subsequent power packs were assembled in Ocala or assembled in The Netherlands and then sent to E-One in Ocala for installation. See Declaration of Kees Henssen, ¶¶ 9-10 (attesting that subsequent power packs were assembled in The Netherlands); Supplemental Affidavit of Richard Grosso, ¶48 (attesting that at least three power packs were assembled in Ocala, Florida).

(9) DLS contracted with Florida Detroit Diesel-Allison North, Inc., a non-party Florida corporation to diagnose and repair one of the power packs in Ocala, Florida;[80]

(10) DLS contracted with JVS, a third-party Dutch consultant, and JVS traveled to Ocala, Florida to aid in the diagnosis of the cause of the failures in the power packs;[81]

(11) DLS sent numerous communications into Florida related to this project;[82] and

(12) DLS executed a promissory note in favor of Emergency One, Inc. (which was later renamed E-One, Inc.) in which DLS agreed to pay on demand the principal sum of $1,000,000.00.[83]

If true, these allegations show that DLS made continuous and systematic contacts with E-One in Florida over the course of at least a two year period.  These alleged contacts are sufficient to show that DLS purposefully availed itself of the privilege of conducting activities within Florida and DLS should reasonably have anticipated being haled into court here.[84]

---

[80] See Supplemental Affidavit of Richard Grosso, ¶¶85-86.

[81] See id., ¶¶91-94.

[82] See Supplemental Affidavit of Richard Grosso, ¶¶95-96.

[83] See Doc. 59, ¶61 & Exhibit 15.

[84] DLS argues that the England forum selection clause reinforces that DLS did not anticipate being haled into a Florida court. However, the forum selection clause, in and of itself, is not sufficient to overcome DLS' continuous and systematic contacts with the State of Florida.  Indeed, a defendant has "fair warning" that a particular activity may subject him to the jurisdiction of a foreign sovereign, where as here, the defendant purposefully directed its activities at the forum and the litigation resulted from alleged injuries that "arise out of or relate to" those activities.  Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 258 (11th Cir. 1996)(citations omitted.)

Moreover, the Court's exercise of personal jurisdiction over DLS comports with traditional notions of fair play and substantial justice.  The Court must consider: (1) the burden on DLS of defending the suit in Florida; (2) Florida's interest in adjudicating the suit; (3) Plaintiffs' interest in obtaining effective relief; (4) the interests of the interstate judicial system in using resources efficiently; and (5) the interests of the states in furthering shared substantive policies.[85]

First, while the burden on DLS caused by litigating outside of The Netherlands is not slight, "modern methods of transportation and communication reduce this burden significantly."[86]  Moreover,  DLS' more than isolated contacts with Florida (i.e., visits to Florida to discuss the project, assist with installation and diagnose and correct the failures) demonstrate that access to Florida is not overly burdensome for DLS.[87]

Second, the State of Florida has a strong interest in seeing this matter resolved in Florida, as the dispute involves services provided by out-of-state professionals (i.e., design and engineering services) to its resident.[88]  Third, E-One, "a Florida resident, has a great interest in the convenience of litigating in [its] home state."[89]  Finally, DLS has not shown (let along argued) that exercising jurisdiction over it would thwart any interest of the states in furthering shared policies or using resources efficiently.  Under these circumstances, exercising jurisdiction over DLS does not offend traditional notions of fair

--------

[85] See Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1221(11th Cir. 1999).

[86] See id.

[87] See id.

[88] See Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 259 (11th Cir. 1996).

[89] Id.

play and substantial justice. Accordingly, DLS' challenges to personal jurisdiction are due to be **DENIED**.

**MTU**

To support their position that the Court has jurisdiction over MTU, Plaintiffs allege in their Complaint and through affidavits various contacts that MTU had with the State of Florida. The Court will discuss these alleged contacts below.

First, Plaintiffs allege that MTU shipped the engines for the first several power packs to Ocala, Florida.[90] MTU has offered affidavit testimony that it delivered the engines to DLS FOB Detroit, Michigan -- not to Ocala, Florida.[91] MTU appears to argue that since the risk of loss passed to DLS in Detroit, shipping engines that ultimately ended up in Ocala, Florida was not a purposeful contact with the State of Florida.

However, there is no evidence suggesting that MTU did not know that the engines were going to Ocala, Florida. Indeed, Plaintiffs have also alleged (and MTU has not offered any contrary evidence) that MTU shipped a container of DLS' parts and tools from The Netherlands to Ocala, Florida.[92] Moreover, it is undisputed that by the time it shipped the first several engines, MTU had already supplied a $1,000,000.00 bank guarantee to E-One, Inc.[93] The bank guarantee recited that DLS had entered into a contract with "Emergency One, Inc., P.O. Box 2710, Ocala, Fl 34479-2710 United States of America . . . for the delivery of 34 powerpacks in accordance with purchase

---

[90] See Amended Complaint, ¶49; Supplemental Affidavit of Richard Grosso, ¶115 & Exhibit 12A.

[91] See Declaration of Gert Jan Van Erkel, ¶¶12-13.

[92] See Supplemental Affidavit of Richard Grosso, ¶140 & Exhibit 10.

[93] See Supplemental Affidavit of Richard Grosso, ¶¶62, 143 & Exhibit 16.

order number 419939 dated September 27th, 2001."  As discussed above, purchase

order number 419339 -- i.e., the First Purchase Order-- provided that the first three

power packs would be assembled in Ocala, Florida.

Second, on at least four occasions, representatives of MTU visited E-One in

Ocala, Florida regarding this project.[94]  Specifically, the MTU representatives visited

Florida to discuss the project, help test the ARFF Vehicle prototypes and to diagnose

the cause of the power pack failures.[95]  This included working "in close [cooperation]"

with JVS in Florida to diagnose the cause of the power pack failures.[96]  MTU attempts to

downplay the significance of these visits by arguing that they were at the request,

expense and direction of DLS.   However, regardless of who asked the MTU employees

to come to Florida, who paid their expenses, and who supervised them, it is undisputed

that during their four visits to E-One's facility, the MTU employees were involved in

testing and diagnosing why the power packs failed. Moreover, Plaintiffs contend that "a

significant portion" of their claims against MTU are based on MTU's alleged failure to

properly diagnose the torsional vibration in September 2002, when MTU came to

---

[94] Plaintiffs argue that at least seven different MTU officers and employees visited Ocala, Florida. See Doc. 49, page 12.  MTU has offered affidavit evidence that representatives of MTU only visited Florida on four occasions.  See Declaration of Gert Jan Van Erkel, ¶15. Additionally, while Plaintiffs allege that Ad Kornet visited E-One in Ocala several times on behalf of MTU (see Declaration of Richard Grosso, ¶¶124-28, 130)  MTU has challenged these allegations with the declaration of Ad Kornet.   See Supplemental Declaration of Ad Kornet, ¶5 ("I never told Mr. Grosso I was acting for MTU in connection with the airport fire rescue vehicle project, and, at no time, did I act on behalf of MTU in connection with that project.")

On three other occasions, allegedly unrelated to the power pack project, representatives of MTU attended the Fort Lauderdale Boat Show to meet with Dutch marine customers.  See Declaration of Gert Jan Van Erkel, ¶16.  Because there is no suggestion that these visits were related to the power pack project, the Court will not consider them in its minimum contacts analysis.

[95] See Supplemental Affidavit of Richard Grosso, ¶¶124-37.

[96] See id., ¶142.

Florida to determine what had caused the first two prototypes to fail.  Thus, Plaintiffs'

claims arise out of actions taken (or not taken) by MTU in Ocala, Florida.

Finally, Plaintiffs allege (and MTU does not dispute) that MTU had significant

contacts with Florida via telephone, facsimile, electronic mail, common carrier, and

courier.[97]  Taken together, these contacts are sufficient to establish that MTU had

minimum contacts with the State of Florida.   MTU's involvement in the project were

such that MTU should have expected to be haled into Florida's courts concerning

disputes arising from the power packs.  Accordingly, MTU's challenges to personal

jurisdiction are due to be **DENIED**.

### B.      Improper Venue

DLS also argues that the case should be dismissed for improper venue pursuant

to Rule 12(b)(3) based on the forum selection clause included in the Second Purchase

Order:[98]

> 24.    LAW AND JURISDICTION
>
> These Conditions and each and every Contract shall be
> (a) governed by English law; and
> (b) subject to the jurisdiction of the English Courts
> Provided that the Buyer shall in its absolute discretion be entitled to refer any
> dispute to arbitration by a single arbitrator appointed (on the Buyer's application)
> by the President for the time being of the Newcastle Law Society.

---

[97] See Supplemental Affidavit of Richard Grosso, ¶¶138-41.

[98] Although MTU did not argue improper venue in its motion to dismiss (Doc. 34), it filed a notice in which it joined and adopted DLS's motion to transfer venue to England or The Netherlands on the basis of forum non conveniens. (Doc. 37.) As noted above, the Court need not determine whether MTU timely challenged venue, because the Court's analysis as to DLS is equally applicable to MTU.

Plaintiff argues that dismissal would be improper because the forum selection clause is permissive, not mandatory; and thus, it may choose to bring the instant action in any jurisdiction, including the Middle District of Florida.[99]

Forum selection clauses are classified as either permissive or mandatory.[100]  A permissive clause authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere.[101]  In contrast, a mandatory clause must be clear, unequivocal and contain language of exclusivity.[102]  Courts have refused to dismiss a suit or transfer an action to the stated forum when the clause is deemed permissive.[103]

Here, the instant forum selection clause does not clearly specify that England is the only place of jurisdiction, nor is there any language prohibiting the parties from bringing covered claims in other courts.  Moreover, a number of courts have found similar provisions to be permissive.[104]  Accordingly, the Court concludes that the instant

---

[99] In its motion to dismiss, DLS relies on the proposition that forum selection clauses should be enforced unless their application would be unreasonable or unjust, without even mentioning the permissive/mandatory distinction.

[100] See Global Satellite Communication Co. v. Starmill U.K. Ltd., 378 F.3d 1269, 1272 (11th Cir. 2004).

[101] See id.

[102] Id.

[103] See Snapper, Inc. v. Redan, 171 F.3d 1249, 1262 n.24 (11th Cir. 1999).

[104] See Stateline Power Corp. v. Kremer, 148 Fed.Appx. 770, 771 (11th Cir. 2005)(finding permissive clause which stated "this Agreement and the rights and obligations hereunder shall be governed by the laws of the State of Florida and the parties to this Agreement specifically consent to the jurisdiction of the courts of the State of Florida over any action arising out of or relating to this Agreement"); Citro Florida, Inc. v. Citrovale, 760 F.2d 1231, 1231-32 (11th Cir. 1985)(finding clause permissive which stated, "place of jurisdiction is Sao Paulo/Brazil" because it did not clearly specify that Sao Paolo was the only place of jurisdiction); Keaty v. Freeport Indonesia, Inc., 503 F.2d 955, 957 (5th Cir. 1974)(finding permissive clause which stated "this agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York"); Wai v. Rainbow Holdings, 315 F.Supp.2d 1261, 1270-73 (S.D. Fla. 2004)(finding clause which read that the "parties hereby agree to
(continued…)

forum selection clause is permissive, and not mandatory.  As such, the relief requested

by DLS -- dismissal for improper venue based on the forum selection clause in the

Second Purchase Order -- is due to be **DENIED**.[105]

.    **C.    Forum Non Conveniens**

Defendants[106] argue that this action should be dismissed on grounds of *forum*

*non conveniens* and heard before a Court in The Netherlands, or alternatively

England.[107] Interestingly, Cushman, which is based in Livonia, Michigan, joins in this

motion contending that it would be more convenient to litigate in The Netherlands or

England than in Florida.  After considering all of the relevant factors, the Court

concludes that this case should not be dismissed on *forum non conveniens* grounds.

The doctrine of *forum non conveniens* "authorizes a trial court to decline to

exercise its jurisdiction, even though the court has venue, where it appears that the

convenience of the parties and the court, and the interests of justice indicate that the

action should be tried in another forum."[108]   The doctrine addresses "whether the actions

---

[104](...continued)
submit [to] the jurisdiction of the courts of Singapore," was permissive); <u>AmerMedCorp. v. Disetronic Holding AG</u>, 6 F.Supp.2d 1371, 1374-75 (N.D. Ga. 1998)(finding permissive clause which stated that "the courts of the canton of Berne, Switzerland, shall have jurisdiction for all disputes arising out between the parties and waive any claim to the contrary").

[105] Based on the Court's conclusion that the forum selection clause is permissive, it need not address Plaintiffs' alternative argument that the England forum selection clause was included in the Second Purchase Order by mutual mistake.  <u>See</u> Doc. 51, pages 10-11.

[106] MTU filed a notice in which it joined and adopted DLS's motion to transfer venue to England or The Netherlands on the basis of *forum non conveniens.* (Doc. 37.)

[107] Defendants do not make any arguments as to why it would be more convenient to litigate this action in England.  Rather, their arguments focus on the connection of this action to The Netherlands.

[108] <u>Ford v. Brown</u>, 319 F.3d 1302, 1306-07 (11th Cir. 2003).

brought are vexatious or oppressive or whether the interests of justice require that the trial be had in a more appropriate forum."[109]  The moving party must demonstrate that (1) an adequate alternative forum is available; (2) the public and private factors weigh in favor of dismissal; and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice.[110]  The Court will turn first to the private and public interest factors.

The Supreme Court has outlined a number of factors for courts to consider in a *forum non conveniens* analysis.  These factors are not exhaustive or dispositive and the Court is free to be flexible in responding to the facts of each case.  The private interest factors include the relative ease of access to sources of proof and evidence; the availability and costs of obtaining willing and unwilling witnesses; and all other practical problems that make the trial of the case "easy, expeditious and inexpensive."[111]  The court must consider these factors of private interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice.[112]  If the court finds this balance of private interests to be in equipoise or near equipoise, it must then determine whether or not factors of public interest tip the balance in favor of a trial in a foreign forum.[113]  The factors of public interest include court congestion and jury duty generated

---

[109] Koster v. Lumbermens Mutual Casualty Co., 330 U.S. 518, 530 (1946).

[110] See Leon v. Million Air, Inc., 251 F.3d 1305, 1310-11 (11th Cir. 2001).

[111] See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).

[112] See SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, 382 F.3d 1097, 1100 (11th Cir. 2004).

[113] See id.

by controversies having no relation to the forum; the desirability of having localized controversies decided at home; and the difficulties attendant to resolving conflict-of-law problems and applying foreign law.[114]

**Private Interest Factors**

In weighing the private interests, the plaintiffs' choice of forum should rarely be disturbed "unless the balance is strongly in favor of the defendant."[115] The presumption in favor of plaintiffs' initial forum  is strongest when the plaintiff is a United States citizen, resident or corporation and the Eleventh Circuit has long mandated that district courts "'require positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion as may exist to deny a United States citizen access to the courts of this country."[116]

Nevertheless, Defendants argue that E-One's choice of forum is entitled to minimal deference for two reasons.  First, Defendants argue that the true party in interest is E-One Europe, a Dutch company.  However, whether E-One Europe is the true contracting party is a disputed issue central to this litigation, and the Court cannot resolve this dispute at this stage in the litigation.[117]  Second, Defendants argue that E-One chose to do business in The Netherlands with Dutch companies.  However, this is

---

[114] See Gulf Oil Corp., 330 U.S. at 508-09.

[115] SME Racks, 382 F.3d at 1101 (quoting Gulf Oil Corp, 330 U.S. at 508).

[116] Id.

[117] See e.g., Doc. 51 at 4 (DLS's entire argument is premised on the erroneous assumption that a subsequent Purchase Order . . . was between DLS and E-One Europe, BV only, and not E-One, Inc").

not a situation where the alleged wrongs occurred primarily in the foreign country,  nor is this a situation where Plaintiffs' claims have no real connection with the chosen forum.  Accordingly, E-One's choice of forum will receive a high level of deference and a presumption of convenience; but, since E-One Europe is a Dutch corporation, its choice of forum is entitled to lesser deference.[118]  However, even according lesser deference to E-One Europe's choice of forum, the Court concludes that the private and public interest factors weigh in favor of this action remaining in Florida.

Access to evidence is perhaps the most important "private interest."[119]  As discussed above, Plaintiffs have alleged breach of contract, breach of warranty and negligence claims arising out of the allegedly defective power packs.  While it is unclear what substantive defenses will be raised by Defendants, evidence related to the assembly and testing of the power packs likely will be central to this litigation.  The parties have offered conflicting affidavit testimony regarding the location of such documents.  Cushman contends that "all" of the documents relating to the assembly and testing of the power packs are located in The Netherlands, while Plaintiffs assert that the majority of E-One and E-One Europe's documents related to this project, including the "red books"[120] are located in Ocala, Florida.[121]  As for the location of physical evidence, there is no dispute that the subject ARFF Vehicles are located in The

---

[118] See Leon v. Million Air, Inc., 251 F.3d 1305, 1310 (11th Cir. 2001).

[119] Ford v. Brown, 319 F.3d 1302, 1308 (11th Cir. 2003).

[120] According to Richard Grosso, the so-called "red books"contain all the documents relating to the assembly and testing of the ARFF Vehicles by E-One.

[121] See Supplemental Affidavit of Richard Grosso, ¶¶103, 111.

Netherlands.  Thus, while the location of the physical evidence supports dismissal, the ease of access to documents does not support dismissal.

The potential witnesses in this case are located both in the United States and The Netherlands.  Representatives from both E-One and Florida Detroit Diesel-Allison North, Inc. (which participated in the disassembly and diagnosis of problems with first power pack) are located in Ocala, Florida.[122]  Additionally, Cushman is located in Michigan, and presumably its' representatives would be located in Michigan.[123] Conversely, representatives from DLS, MTU, E-One Europe, JVS and Techno Fysica, B.V. are located in The Netherlands.[124]  It should be noted that a number of the potential witnesses identified by defendants as being located in The Netherlands traveled to Ocala, Florida to assist in assembling the power packs, testing the prototype ARFF Vehicles and determining the cause of the power pack failures.  Thus, because the witnesses are divided between the United States and The Netherlands and because a number of potential witnesses from The Netherlands traveled to Ocala regarding the power packs, the location of witnesses does not support dismissal.

**Public Interest Factors**

The Court will now turn to the public interest factors to determine whether they tip the balance in favor of a trial in a foreign forum.  Although this Court has a crowded docket, this is not a case where the community served by this Court bears no relation to

---

[122] See id., ¶¶98-99.

[123] Under federal law, a trial court is "required to focus on the connections between [Plaintiffs'] suit and the whole United States" and not only the connection to Florida.  Esfeld v. Costa Crociere, S.P.A., 289 F.3d 1300, 1304 (11th Cir. 2002).

[124] See Sworn Declaration of Richard Cushman, ¶25; Declaration of Kees Henssen, ¶¶13, 14, 16.

the litigation since a member of that community is a plaintiff to this action.  Indeed, E-One has been headquartered in Ocala, Florida since the 1970's.[125]  Moreover, Plaintiffs allege that foreign companies caused significant injuries to E-One in the State of Florida by breaching contracts, breaching warranties and committing negligence. The State of Florida has a strong interest in protecting the interests of its corporate citizens.

Nevertheless, Defendants argue that the Courts of The Netherlands have a greater interest in deciding this action.  Defendants point out that several of the parties are Dutch companies (E-One Europe, DLS and MTU), that the ARFF Vehicles were purchased by The Royal Netherlands Air Force, The Royal Netherlands Navy, and the Amsterdam Airport Schiphol, and that the majority of the power packs were assembled and installed in ARFF Vehicles in The Netherlands.   While this may be true,  Plaintiffs' lawsuit focuses in large part on events that allegedly occurred in Florida and injuries allegedly suffered in Florida as a result of the actions of these foreign defendants. Accordingly, it cannot be said that The Netherlands has a greater interest in deciding this action.

Finally, although the need to apply foreign law is a public-interest factor that mitigates strongly in favor of dismissal, it is unclear what law will govern this cause of action.  As discussed above, there are two relevant choice of law provisions -- the Florida choice of law provision in the First Purchase Order and the English choice of law provision in the Second Purchase Order.  Whether these provisions will govern (all or parts of) this dispute, is yet to be determined.  Moreover, the parties disagree as to

---

[125] See Supplemental Affidavit of Richard Grosso, ¶6; Doc. 50, page 8.

whether Florida or Dutch law would be applicable under a choice of law analysis.  As such, because it is unclear whether this Court would even need to apply foreign law, this factor does not weigh in favor of dismissal.

Based on the foregoing, the balance of private and public interest factors are not "strongly in favor of the defendant[s]", and as such, Plaintiffs' choice of forum should not be disturbed.[126]  Accordingly, Defendants' motions to dismiss this action based on *forum non conveniens* are due to be **DENIED**.

### D.    Change of Venue

Because the Court has concluded that this action should not be dismissed pursuant to *forum non conveniens*, it must consider Cushman's alternative argument -- i.e., that pursuant to 28 U.S.C. §1404(a), venue should be changed to a Michigan District Court based on the forum selection clause in the agreement between Cushman and DLS.[127]  The forum selection clause provides:

> APPLICABLE LAWS: This contract shall be interpreted in accordance with and governed by the laws of the State of Michigan.  Buyer consents to personal jurisdiction and venue in state or federal court in Wayne or Oakland County, Michigan (at RCA's option) for purposes of resolving any disputes hereunder.

28 U.S.C. § 1404(a) provides in relevant part that: "[F]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The district court's discretion to decide a motion to transfer should be based on an individualized,

---

[126] Gulf Oil, Inc., 330 U.S. at 508.

[127] Cushman's argument seems to be  intellectually inconsistent with its argument that this action should be dismissed under *forum non conveniens* because The Netherlands or England are the most convenient forums.

case-by-case consideration of convenience and fairness."[128]   However, a valid forum

selection clause is "a significant factor that figures centrally in the district court's

calculus."[129]

In deciding a motion to transfer, the Court also considers private interest factors

such as: (1) the plaintiff's forum preference as manifested in the original choice, (2) the

defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of

the parties as evidenced by their relative physical and financial condition, (5) the

convenience of the witnesses, but only to the extent that the witnesses may actually be

unavailable for trial in one of the fora, and (6) the location of books and records, but

only to the extent that the files could not be produced in the alternative forum.[130]   Public

interests that courts have considered include: (1) the enforceability of the judgment, (2)

practical considerations that could make the trial easy, expeditious or inexpensive, (3)

the relative administrative difficulty in the two fora resulting from Court congestion; and

(4) the local interest in deciding local controversies at home.[131]

Although Plaintiffs were not signatories to the contract between DLS and

Cushman,  Cushman argues that Plaintiffs should be bound by the forum selection

---

[128] Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29 108 S.Ct. 2239, 2244, 101 L.Ed.2d 22 (1988).

[129] See id.

[130] Jumara v. State Farm Insurance Co., 55 F.3d 873, 879 (3rd Cir. 1995); see also, Pilkington v. United Airlines, Inc., 855 F.Supp. 1248, 1250 (M.D. Fla. 1994)("Court considers factors such as: plaintiff's initial choice of forum, convenience of the parties and witnesses, relative ease of access to sources of proof, availability of compulsory process for witnesses, location of relevant documents, financial ability to bear the cost of the change, and all other practical problems that make trial of th case easy, expeditious and inexpensive.").

[131] Id.

clause because Plaintiffs allege in their Amended Complaint that they are third-party beneficiaries of that contract.  Cushman cites <u>Lipcon v. Underwriters at Lloyd's, London</u>, 148 F.3d 1285 (11th Cir. 1998) for the proposition that a non-party to a forum selection clause can be bound where the non-party is "'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound."  However, <u>Lipcon</u> is readily distinguishable from the instant case.  In <u>Lipcon</u>, the Eleventh Circuit affirmed the district court's conclusion that spouses -- who were non-parties to the forum selection clause -- were nevertheless bound by the forum selection clause because their interests were "completely derivative" of their spouses who were parties to the forum selection clause.  Here, while Plaintiffs have asserted eight counts against Cushman including claims for breaches of contract, breaches of warranty, negligent misrepresentation and negligence, only one of those claims is based on Plaintiffs' alleged  third-party beneficiary status.[132]   As such, it cannot be said that Plaintiffs' claims are "completely derivative" of Cushman's contract with DLS.

Moreover, even assuming *arguendo* that Plaintiffs are bound by the forum selection clause, the instant forum selection clause is permissive, and as such, it is not entitled to controlling weight in the 1404(a) analysis.[133]   By definition, a permissive

---

[132] In Count Two Plaintiffs allege breach of contract against Cushman under an agency theory; in Count Four, Plaintiffs allege breach of contract against Cushman under a third-party beneficiary theory; in Count Seven, Plaintiffs allege breach of express warranty against Cushman; in Count Ten, Plaintiffs allege breach of warranty of fitness for a particular purpose against Cushman; in Count Thirteen, Plaintiffs allege breach of implied warranty against Cushman; in Count Sixteen, Plaintiffs allege breach of covenant of good faith and fair dealing against Cushman; in Count Eighteen, Plaintiffs allege negligent misrepresentation against Cushman; and in Count Twenty, Plaintiffs allege negligence against all defendants, including Cushman.

[133] <u>See</u> <u>Snapper, Inc. v. Redan</u>, 171 F.3d 1249, 1262 n.24 (11th Cir. 1999)(noting that Courts have refused to dismiss a suit or transfer an action when the clause is deemed permissive).

clause merely authorizes  jurisdiction in a designated forum without prohibiting litigation elsewhere.[134]  In contrast, a mandatory clause clearly and unequivocally dictates an exclusive forum for litigation under the contract.[135]   Here, the instant forum selection clause does not specify that Michigan is the only place of jurisdiction, nor is there any language prohibiting the parties from bringing covered claims in other courts.[136]   It merely provides that DLS "consents to personal jurisdiction and venue in state or federal courts in Wayne or Oakland County, Michigan . . . for purposes of resolving any disputes hereunder."

Other than the forum selection clause, Cushman does not make any arguments as to why this action should be transferred to Michigan.  Cushman does not contend that Michigan would be a more convenient forum nor does it argue that any of the private or public factors weigh in favor of transfer.  Accordingly, Cushman has failed to establish that this action should be transferred pursuant to 1404(a).

---

[134] See Global Satellite, 378 F.3d at 1272.

[135] Id.; Citro Fla., 1231-32; Global Satellite Communication Co. V. Starmill U.K. Ltd., 378 F.3d 1269, 1272 (11th Cir. 2004).

[136] See Stateline Power Corp. v. Kremer, 148 Fed.Appx. 770, 771 (11th Cir. 2005)(finding permissive clause which stated "this Agreement and the rights and obligations hereunder shall be governed by the laws of the State of Florida and the parties to this Agreement specifically consent to the jurisdiction of the courts of the State of Florida over any action arising out of or relating to this Agreement"); Citro Florida, Inc. v. Citrovale, 760 F.2d 1231, 1231-32 (11th Cir. 1985)(finding clause permissive which stated, "place of jurisdiction is Sao Paulo/Brazil" because it did not clearly specify that Sao Paolo was the only place of jurisdiction); Keaty v. Freeport Indonesia, Inc., 503 F.2d 955, 957 (5th Cir. 1974)(finding permissive clause which stated "this agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York"); Wai v. Rainbow Holdings, 315 F.Supp.2d 1261, 1270-73 (S.D. Fla. 2004)(finding clause which read that the "parties hereby agree to submit [to] the jurisdiction of the courts of Singapore," was permissive); AmerMedCorp. v. Disetronic Holding AG, 6 F.Supp.2d 1371, 1374-75 (N.D. Ga. 1998)(finding permissive clause which stated that "the courts of the canton of Berne, Switzerland, shall have jurisdiction for all disputes arising out between the parties and waive any claim to the contrary").

Finally, transferring Plaintiffs' claims against Cushman to a Michigan district court would be both inefficient and a waste of judicial resources.  There is no question that Plaintiffs' claims against Cushman are closely related to its claims against the other defendants, DLS and MTU.  Accordingly, Cushman's motion to change venue is due to be **DENIED**.

## III.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that:

(a) Motion of Defendant Drive Line Systems B.V. To Dismiss (Doc. 28) should be **DENIED**;

(b) Defendant R. Cushman & Associates, Inc.'s Motion To Dismiss For Forum Non Conveniens And In The Alternative, For a Change Of Venue Based Upon The Parties' Forum Selection Clause (Doc. 31) should be **DENIED**; and

(c) MTU Detroit Diesel Benelux's Motion To Dismiss And/Or Quash Service Of Process (Doc. 34) should be **DENIED.**

**IN CHAMBERS** in Ocala, Florida, on May 15, 2006.

_____
GARY R. JONES
United States Magistrate Judge


Copies to:
    The Honorable Wm. Terrell Hodges
    Senior United States District Judge

    Counsel of Record